## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 18-CV-24586-PCH
### 18-CV-24472-JEM

ALEXANDER JOHNSON

      Plaintiff,

v.

OCARIS MANAGEMENT GROUP, INC.

      Defendant.

_____/

ALEXANDER JOHNSON

      Plaintiff,

v.

27th AVENUE CARAF, INC. d/b/a Caraf Oil

      Defendant.

_____/

### PLAINTIFF ALEXANDER JOHNSON'S MEMORANDUM
### REGARDING IMPOSITION OF SANCTIONS

COMES NOW, Alexander Johnson, by and through his undersigned counsel, who files this memorandum in connection with the Court's announced intention to impose sanctions on him in connection with the above-referenced cases.

### INTRODUCTION

On July 22, 2019, the Court held a hearing on its previously entered Rule to Show Cause. Various objections, both evidentiary and with respect to privilege, have been asserted both orally in the July 22 and prior hearings as well as in writing (Motion in

Limine (D.E. 58)). During the July 22 hearing, the Court admitted into evidence on its own motion approximately thirty (30) exhibits culled from the documents ordered produced by Messrs. Johnson and Dinin, many over Mr. Johnson's prior objection.

At the end of the hearing, the Court invited counsel to submit exhibits, present legal argument and file a statement of financial condition for Mr. Johnson, recognizing that a Rule 11 monetary sanction must take into account Mr. Johnson's ability to pay.

## ARGUMENT

### A. Exhibits

For purposes of a clear record, the undersigned wishes to designate the following documents as exhibits, some of which have already been filed:

Exhibits J-1 through J-10: These documents were provided to the Court as attachments to the undersigned's Memorandum Regarding Compliance With Court Order (D.E. 38), that was filed in response to the Court's order dated on May 23, 2019 (D.E. 34). The documents address the good faith basis for filing the Ocaris complaint (J-1 through J-3); pending complaint to the Florida Commission on Human Relations as to *Ocaris* (J-4); documentary proof of Mr. Johnson's hearing disability (J-5 through J-7); and proof that Mr. Johnson regularly travels to West Flagler Street in Miami and to Metro Zoo in Southwest Miami Dade County (J-8, 9 and 10).

Exhibits J-11 through J-13: These are the retainer agreements in the *Ocaris, Caraf,* and *Roshni Investment* cases. Each agreement makes it clear that Mr. Dinin, in his

capacity as Mr. Johnson's lawyer in these and every subject ADA case, "will handle all aspects of the Matter including but not limited to pleadings, negotiations for settlements, and any litigation, mediation or other proceedings through final judgment." *See* page 1 of Exhibits J-11, J-12 and J-13.

Exhibit J-14: This document is the complete email thread between Messrs. Johnson and Dinin dated October 25, 2018, which contains what the Court has dubbed the "sabotage email."

### B. Analysis

1. During the hearing on May 9, 2019, and in the Court's written order dated May 25, 2019, the Court expressed doubt about whether there was any input from Mr. Johnson prior to the filing of *Ocaris* and *Caraf* complaints. Exhibits J-1 through J-3 demonstrate how well Mr. Johnson documented his complaint in the *Ocaris* case. This level of care and attention to detail by Mr. Johnson was employed in every case referred by him to his counsel.

2. Exhibit J-4 confirmed that there was a pending complaint filed before the Florida Commission on Human Relations as to the *Ocaris* case, resolving another doubt expressed by the Court.

3. The Court was also apparently concerned about whether Mr. Johnson was actually hearing impaired. Results of two recent audiograms confirmed that Mr. Johnson is functionally deaf. *See* Exhibits J-6 and J-7.

4. The Court also questioned whether Mr. Johnson, who resides in Ft. Lauderdale, had a legitimate reason to initially visit and then return to gas stations on West Flagler Street in Miami and near MetroZoo in southwest Miami-Dade County. The gas station that is the subject of the *Ocaris* case, located on West Flagler Street, is one block from the pharmacy where Mr. Johnson travels each month to pick up medication for his life partner. Similarly, other gas stations are located near MetroZoo in southwest Miami-Dade County (Exhibits J-8, 9). Mr. Johnson purchased an annual pass in 2018 because of his frequent visits to the zoo (J-10).

5. Most damning is the Court's expressed view that Mr. Johnson, a non-lawyer, was providing directions to his lawyer, Scott Dinin, about legal matters that Mr. Dinin was required to follow, in violation of Florida Bar Rule 4-5.4 (Professional Independence of a Lawyer). The basis for drawing that conclusion was the so-called "sabotage email" marked here as Exhibit J-14. The Court has effectively accused Mr. Johnson of the unauthorized practice of law.[1] Nothing could be further from the truth.

First, Exhibits J-11 through 13 make it crystal clear that in each of these cases, Mr. Dinin was the lawyer and Mr. Johnson the client; and that Mr. Dinin and not Mr. Johnson was contractually obligated to handle all aspects of the case. Mr. Dinin was also obligated by the binding retainer agreement to seek injunctive relief and compensatory damages

---

[1] The Court stated: "It's my view that that [Rule 4-5.4] was also violated, based on the sabotage email because that was Mr. Johnson telling Mr. Dinin how to proceed in this case. In other words, don't let the gas station owners know that they can get out of this situation very simply by turning off the videos." (D.E. 78 at 56).

under the applicable federal and Florida state laws. The retainer agreements also required

that Mr. Johnson "attest[s] that he has made *only truthful representations* to [Mr. Dinin]

of the discrimination he incurred at the gas station." Exhibits. 11-13, p. 2 (Emphasis

Added).

Second, consistent with his contractual obligation to provide his lawyer with

accurate factual information in support of the *Caraf* complaint is the email that is Exhibit

J-14 on which the Court has based its conclusion. But the portion of the email chain relied

on by the Court was actually a response by Mr. Johnson to a request from his attorney on

October 23, 2018, for Mr. Johnson to comment on the accuracy of a draft complaint. Mr.

Dinin, or someone at his direction, wrote: "[S]ee attached complaint, review, and if all the

facts are correct, please sign and date the exhibit A verification and return to us so we can

file the complaint." Mr. Johnson suggested changes to the wording in three paragraphs,

and he spotted a material misrepresentation of fact in paragraph 16 of the *Caraf*

complaint. Mr. Johnson's response read as follows:

> [P]lease remove
>
> "Defendant's representative did not turn off the television media feature within the
> gas pump to prevent further discrimination."
>
> (I do not know if this is true or not. Perhaps they did after I drove off. In any case
> we do not need to sabotage our other cases by providing defendants a defense by
> giving them a partial remedy and answer to our complaints.)

The Court has concluded from this email that Mr. Johnson was effectively acting as the lawyer in his own case and that the cases filed on Mr. Johnson's behalf were not "well-intended." (D.E.78:49). In fact, Mr. Johnson was responding to a request from *his* lawyer to vette the draft complaint and pinpoint errors or omissions. And that he did by advising his lawyer that the quoted sentence was inaccurate. By removing the sentence from the complaint, Mr. Dinin was insuring that the facts alleged in the *Ocaris* complaint were accurate, which is what an attorney is supposed to do. Mr. Dinin surely would have removed the inaccurate sentence even if Mr. Johnson had not included his strategic observation in the email, because it was Mr. Dinin's practice in other cases to rely on Mr. Johnson's representations about factual matters.

This is hardly the unauthorized practice of law. To the contrary, Mr. Dinin was required to consult with Mr. Johnson about the factual accuracy of the complaint. He could even consult with his client about litigation strategy. *See Florida v. Nixon*, 125 S.Ct 551, 560 (2004) ("An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy."). The Florida Supreme Court has defined the practice of law as the performance of services in representing another before the courts. *State ex rel. The Florida Bar v. Sperry*, 140 So.587, 591 (Fla. 1962), *vacated on other grounds*, 373 U.S. 379 (1963). The *Sperry* court further specified: "But the practice of law also includes the giving of legal advice and counsel to others as to their rights and obligations under the law and the preparation

of legal instruments, including contracts, by which legal rights are either obtained, secured or given away, although such matter may not then or ever be the subject of proceedings in a court." *Id.* And a judge in this court has made it clear that a client may assist in the preparation of his own case so long as the case is "overseen, reviewed, and submitted to the Court by his attorneys." *Abromats v. Abromats*, 2016 WL 6775207 (S.D. Fla. 2016). That is precisely what occurred here.

Mr. Johnson was at all times the client in these cases, and he (Johnson) was not giving legal advice to a third party-client; only commenting that he did not wish to subscribe to false and unverified facts that would tarnish his credibility in other pending cases.

6. The Court also viewed the "sabotage email" as an effort by Mr. Johnson to maintain the financial viability of other gas pump cases by not revealing in a complaint that the defendants could escape paying a settlement by turning off their video screens. The Court has further concluded that the referenced email "undermines any semblance of doing this for the right reason." (D.E. 78:90).

A. As a practical matter, it would not require a corporate genius to quickly conclude on their own as soon as a complaint was served on them that one way to avoid damages was to turn off the video screens. However, Mr. Johnson's litigation goal was to require companies to make the video screens accessible to the hearing impaired by including closed captioning, as evidenced by the result in the *Speedway* cases, and not for

the companies to shut down the videos completely.[2] But Mr. Dinin was not always able to negotiate the desired result in an immediate time frame, and he settled in some instances for the videos to be shut down until closed captioning could be installed.

We ask the Court to keep in mind that it was Mr. Dinin who handled settlement negotiations and not Mr. Johnson, and that Mr. Dinin had interests apart from those of Mr. Johnson. The Court's interpretation of Mr. Johnson's remarks - - that he was concerned only with the financial viability of future gasoline pump cases for his own benefit - - is not the only conclusion to be drawn from Mr. Johnson's parenthesis-cloaked observation. Alternatively, we ask the Court to consider that Mr. Johnson was concerned that by inserting the factually incorrect statement, even if true, would incentivize defendants to permanently turn off their video screens in lieu of installing closed captioning. Mr. Johnson's history in other cases examined by the Court confirms that the installation of closed captioning was Mr. Johnson's litigation goal, even if the installation of closed captioning would take time, and that goal was the "right reason" for bringing these lawsuits.

B.  Finally, the Court questioned Mr. Johnson's motivation for bringing these cases. To support the observation, the Court stated that, "Mr. Dinin has been quoted in the

---

[2] Paragraph 39(b) of the *Ocaris* complaint sought "[a]n Order mandating that the Defendant furnish appropriate auxiliary aids and services for patrons who are deaf or hard of hearing in all of its audio/visual media features (including but not limited to providing close captioning) where necessary and to ensure effective communication with people with disabilities." The complaint did not seek shutting down the video screens.

news media as saying that he thinks that people like Mr. Johnson are, quote - - heros [sic] - - closed quote, and that he is seeking to enforce civil rights for those so they're not left behind." (D.E. 78:50). It was Mr. Dinin and not Mr. Johnson who gave press interviews in which he characterized Mr. Johnson as a hero. That sort of press exposure benefitted Mr. Dinin, whose entire practice is the filing of ADA cases brought to him by several testers, and not Mr. Johnson.

We do not suggest that Mr. Johnson's motivation for becoming a tester was entirely altruistic. He clearly wished to collect appropriate damages for his efforts in the process of obtaining a lasting result that would benefit those like him who are hearing impaired. But it is likewise unfair for the Court to conclude from the "sabotage email" that Mr. Johnson was engaging in a ruse solely for the purpose of making money.

## C. Legal Issues

Mr. Johnson's legal arguments concerning the conduct of the Court's *sua sponte* investigation, the ordered production of records, and the admissibility of those records in the show cause hearing as against Mr. Johnson have been previously detailed in the undersigned's Motion in Limine (D.E. 58), and in argument during the hearings of June 17, 2019 (D.E. 75), and July 22, 2019 (D.E. 78). We reiterate those objections and arguments here. We also move to strike the admission of the following evidence at the July 22 hearing as against Mr. Johnson: all settlement agreements; all settlement statements; and Mr. Johnson's Form 1099's for the years 2016, 2017 and 2018.

With respect to the Court's refusal to refer this matter and all objections to a Special Master or a Magistrate Judge, we wish to cite *Adams v. Bellsouth Telecommunications, Inc,* 2001 WL 34032759 (S.D. Fla. 2001), as an example of the appropriate procedure that should have been employed in this case (Judge Middlebrooks appointed a Special Master to conduct a sanctions hearing and rule on objections).

### D. Finances

Mr. Johnson's financial condition as of July 22, 2019, was as follows:

» Assets not subject to homestead exemption- $26,265 (approx)

» Monthly Social Security Disability Income- $1,978

» Balances from six (6) credit card accounts- $13,006

» Recurring monthly bills (taxes, insurance, utilities) - $1,057 (approx)[3]

Since July 22, Mr. Johnson has retained the undersigned to handle the appeal of this Court's ruling in this case to the Eleventh Circuit ($20,000 for legal fees and a $1,000 cost retainer), leaving him with approximately $8,000 in cash and credit card bills amounting to $13,006 as of that date.[4] Given Mr. Johnson's meager present income and

---

[3] The undersigned has examined documents estimating the fair market value of a boat and scooter, documents evidencing what is owed on six (6) credit cards, Mr. Johnson's Social Security monthly net payment and evidence of his recurring bills. Those documents have not been attached as exhibits to protect Mr. Johnson from persons who would misuse that information.

[4] The undersigned has placed the appellate retainers in his trust account pending an analysis of the Court's written order imposing sanctions and a final decision by Mr. Johnson about whether to appeal the Court's ruling.

his debt obligations, Mr. Johnson is hardly in a position to afford a monetary sanction, no less a double sanction, since he has been classified as "disabled" by the Social Security Administration and unable to work.[5] Mr. Johnson will likely be required to sell a small boat and/or the motor scooter, which accounts for approximately $14,500 of the $26,265 of assets not subject to homestead exemption, in order to meet his present financial obligations.

## E. Other Arguments

Finally, the undersigned wishes to make a number of observations:

• The evidence in this matter categorically demonstrates that Mr. Dinin was the lawyer and Mr. Johnson the client in each of these cases. As such, in the face of no contrary evidence and upon information and belief, it was Mr. Dinin who decided to allege a violation of the Florida Civil Rights Act (Count 2 in the referenced complaints), and not Mr. Johnson. This is not to suggest that Mr. Johnson was without damages or did not wish to be compensated for his role as a tester. However, in an effort to pay Mr. Johnson before his administrative remedies were exhausted in Florida, Mr. Dinin foolishly alleged count 2 in an effort to induce settlements. He could have accomplished

---

[5] The undersigned is also holding two checks dated June 26, 2019, from Mr. Dinin's trust account to Mr. Johnson in connection with the settlements in the *MC Energy, LLC* and *Montebana Fuels LLC* cases in the amounts of $1555 and $1531, respectively. Both are gasoline pump cases. The checks are being held subject to the Court's direction. Mr. Johnson is also due some money from other non-gasoline pump ADA cases that have been properly settled. At Mr. Johnson's request, Mr. Dinin is preparing an accounting of these cases. The accounting has not been provided as of the filing of this memorandum.

the same goal legitimately by bringing a one count complaint charging an ADA violation that sought only injunctive relief while also having Mr. Johnson file his administrative complaint with Florida seeking damages. Mr. Dinin could have then entered into discussions for a global settlement of the federal lawsuit and the Florida complaint, and constructed a settlement agreement that resolved the injunctive relief and provided for an amount for legal fees in the federal case, and damages to Mr. Johnson in satisfaction of the Florida complaint - - a distinction with a difference. The mistake was Dinin's and not Johnson's.

• Mr. Johnson has discharged Mr. Dinin as his attorney, requested an accounting for all pending cases and money held in trust by Mr. Dinin, and Mr. Johnson has directed Mr. Dinin to retain all files and cease all activity on Mr. Johnson's behalf. If nothing else, Mr. Johnson must retain other counsel (not the undersigned), to close out the open cases pending in the Southern District of Florida and to properly advise him going forward.

• Under Rule 11, a sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). The sanction may include "an order to pay a penalty into court" if the Court is acting *sua sponte*, as it is here. *Id.* The Court must also consider the following factors in fashioning the appropriate sanction:

> (1) "[w]hether the improper conduct was willful, or negligent"; (2)
> "whether it was part of a pattern of activity, or an isolated event"; (3)

"whether it infected the entire pleading, or only one particular count or defense"; (4) "whether the person has engaged in similar conduct in other litigation"; (5) "whether it was intended to injure"; (6) "what effect it had on the litigation process in time or expense"; (7) "whether the responsible person is trained in the law"; (8) "what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case"; and (9) "what amount is needed to deter similar activity by other litigants."

*Thomas v. Early Cty., Ga.*, 518 F. App'x 645, 646 (11th Cir. 2013).

Applying these factors only to Mr. Johnson, the improper conduct, which was to allege count 2 in the referenced gasoline pump cases, was on Mr. Dinin's advice. Therefore, the improper conduct was not willful as to Mr. Johnson. Similarly, alleging count 2 was part of a pattern sanctioned by Mr. Dinin; inserting count 2 did not infect the entire pleading, nor was it intended to injure; the presence of count 2 actually shortened the litigation process since it resulted in quick settlements; Mr. Johnson was not the person trained in the law; and given Mr. Johnson's role and ability to pay, no monetary sanction should be levied against him.

• The Court has also announced that it is considering imposing a sanction on Mr. Johnson that would preclude him from acting as plaintiff in cases involving ADA violations in any United States District Court. Assuming the Court could impose such a

sanction, we believe it to be unnecessary as to Mr. Johnson (as argued by the undersigned on July 22). Such a draconian sanction would deprive Mr. Johnson of his rights under the U.S. Constitution and would be inconsistent with his right to be a tester pursuant to *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323 (11th Cir. 2013). Congress has specifically provided in 42 U.S.C.§12188(a)(1), that the enforcement remedy is available "to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter [Title III]." *Houston, supra* at 1329. To deprive Mr. Johnson of the remedies afforded by Title 42 would be both unnecessary and unconstitutional.

## CONCLUSION

Mr. Johnson would not have been in this position were it not for Mr. Dinin's bad advice. While he may have been versed in recognizing ADA violations and in gathering the facts needed for a complaint, Mr. Johnson was not a trained lawyer and did not appreciate the ethical implications of Mr. Dinin's decision to put count 2 in each lawsuit and to share his legal fee with Mr. Johnson. That was the responsibility of Mr. Dinin.

We respectfully suggest that Mr. Johnson requires no further sanction from this Court. Going forward, he need only retain a competent and ethical lawyer who is well-versed in ADA cases.

Respectfully submitted,

s/ Thomas D. Sclafani
Thomas D. Sclafani, Esq.
SCLAFANI & ASSOCIATES, P.A.
633 South Andrews Avenue, Suite 500
Fort Lauderdale, Florida 33301
Telephone:  (954) 892-7333
Facsimile:   (954) 764-2443
Florida Bar No. 232483

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 9, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either by transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

s/Thomas D. Sclafani